### MIMS v. REID.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1923.)

No. 2022.

1. **Appeal and error ☞927(7)—On review of directed verdict for defendant, plaintiff's evidence must be taken as true.**

On review of a ruling directing a verdict for defendant, such differences as there are in the versions of plaintiff and defendant with reference to the transaction between them must be resolved in favor of the plaintiff.

2. **Brokers ☞86(1)—Evidence held to show agreement to pay for services in interesting purchasers in property.**

Evidence *held* to show that defendant, who was desirous of selling a mine, agreed to pay plaintiff for the latter's services in aiding defendant in selling his mine to those interested in an adjoining mining company, which whom plaintiff was well acquainted.

3. **Brokers ☞49(3)—Agreement to pay for sale to certain people requires payment for sale through one of them.**

An agreement to pay plaintiff for his services in securing a sale of defendant's mine to the "Compton people," who were interested in a corporation owning an adjoining mine, entitles plaintiff to compensation, where the sale was effected through negotiations with one of those people, but was made to a different corporation.

4. **Brokers ☞85(5)—Price paid for property long before is immaterial in suit for procuring sale.**

In an action by plaintiff for compensation for aiding defendant in making a sale of his mine, evidence as to the price paid by defendant many years before for the property was immaterial, and was properly excluded.

5. **Brokers ☞85(1)—Negotiations as to sale to another held immaterial.**

In an action for compensation in effecting a sale of defendant's mine to specified purchasers, evidence as to the visit of plaintiff to defendant concerning another probable purchaser in case the negotiations with the designated purchaser failed had only a remote bearing on the controversy, and there was no error in excluding it.

6. **Brokers ☞85(1)—Plaintiff's failure to claim compensation after sale is competent as to construction by parties.**

In an action by plaintiff to enforce an alleged agreement by defendant to pay plaintiff for aiding in effecting a sale of defendant's mine, evidence of plaintiff's failure to make a claim against defendant after the sale was competent on the issue between the parties as to the construction placed by plaintiff on his agreement with defendant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Appeal and error ☞1050(1)—Admission of immaterial telegram is not reversible error.**

Where a telegram introduced in evidence could not have affected the issues between the parties, its admission was not reversible error.

In Error to the District Court of the United States for the Western District of Virginia, at Harrisonburg; Henry Clay McDowell, Judge.

Action at law by John W. Mims against Legh W. Reid. Judgment for defendant on directed verdict, and plaintiff brings error. Reversed.

D. O. Dechert, of Harrisonburg, Va. (Wm. F. Keyser, of Luray, Va., on the brief), for plaintiff in error.

J. K. M. Norton, of Alexandria, Va. (John T. Harris, of Harrisonburg, Va., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and WEBB, District Judge.

WOODS, Circuit Judge. [1] The main issue is whether the District Judge was right in directing a verdict for the defendant in this action, based on an alleged contract by defendant to compensate the plaintiff for services rendered in the sale of defendant's property. On this issue such differences as there are in the version of plaintiff and defendant of the transaction between them must be resolved in favor of plaintiff.

The defendant, Reid, a professor in Haverford College, Pa., owned a manganese mine near Luray, Va. Reid was anxious to sell, and had in view a sale to the owners of the Compton mine, which was near by. Mims was proprietor of a hotel at Luray. Reid had frequently stopped at the hotel and knew Mims well. In July, 1917, while Reid was at Mims' hotel, Max Bruening and several others interested in the Compton mine came there. Mims gives this account of the conversation on this occasion between him and Reid:

"Dr. Reid said to me, 'John, you know all these Compton people, or all these people, who are interested in the Compton mine, and I am very anxious to sell this property at Stanley, and you are in a position to do me some good, in that you know all these men. * * * Get some of these fellows and interest them in the property, and let's sell it to them, and I will pay you well for it.' I said, 'Well, Doctor, I will see what I can do.'"

According to Mims' testimony, he introduced Reid to Bruening on Sunday morning, and on that day induced Bruening and Watson, superintendent of the Compton mines, to go to Reid's mine and make an examination. Before taking the trip and after their return Bruening and Watson went to Reid's room with him and examined the maps of the mine. Mims gave this account of his subsequent action:

"Every time I saw Mr. Bruening after that, we talked over this property, relative to the sale of it to him. I could not tell exactly how often I saw and talked with Mr. Bruening after the first conversation in reference to the property. He would come up to the hotel when he was down at Compton, usually coming Saturday night and spending Sunday with us. I should say I talked with him from six to eight or ten times, probably. This is a guess. We talked over the property every time we met. I would ask him how it was progressing and how he was getting along with it. I was doing everything I

could to urge a sale of the property. Dr. Reid spoke to me three or four times about interesting some of these people, as I knew them so well."

Bruening testified that he became interested in the property on the Sunday he was introduced to Reid, and corroborated Mims as to his interest and activity. Watson testified that the examination of the property on Sunday morning was made at the urgent request of Mims on account of Mims' interest in the sale. Bruening finally effected a sale for $125,000 about October 1, 1917, not to the Compton Manganese Corporation, but, through A. P. Meyer of Pittsburg, Pa., to the Shenendoah Valley Manganese Company.

[2] Taking the evidence we have set out as true, there can be no doubt that a contract was made looking to the compensation of Mims for any service rendered in the sale of the land to the "Compton people," through negotiations with Bruening or others interested in the Compton Corporation, and that Mims aided in interesting Bruening, through whom the sale was afterwards made. Mims was not a broker. He did not pretend that any right was conferred on him to sell the property, or that he had any control of the sale of it, or that he was to receive any commission or brokerage; nor does he claim that he was the sole efficient proximate cause of the sale. There is nothing that distinguishes the alleged contract for service from any other contract for a specified service for a fair, but indefinite, compensation. 9 C. J. 572.

[3] The argument is made that Mims cannot recover because the contract was for compensation for services rendered in bringing about a sale to the Compton Corporation, whereas the sale was actually made through Bruening to a third party. We think the distinction too fine. The agreement was for compensation for aiding in a sale to the "Compton people." From the beginning of the negotiations in July until the last of September, Bruening led both Reid and Mims to believe that he was negotiating for the Compton Corporation. Besides, Reid was entirely indifferent as to the purchaser so long as he got his price. He engaged Mims to promote the sale by bringing the property to the attention of the officers of the Compton company, whom Mims knew well. If Mims did that, and his service contributed to the sale made through one of the "Compton people," his compensation was earned. 9 C. J. 613. The matter is made plain by illustration. Suppose, after the agreement between Reid and Mims, the introduction of Bruening as a prospective purchaser and the inspection of the property by Bruening at the instance of Mims, Bruening had said then and there:

"The Compton Corporation does not want the mine, but here and now I purchase it for another."

Could Reid be allowed to deny Mims compensation on the ground that the sale had not been made to the Compton Corporation? There was no break in the continuity of negotiations which the evidence tends to show Mims had helped to set on foot from the beginning to the consummation of the sale. We think the evidence on behalf of the plaintiff tends to show a contract to pay the plaintiff for service in case the service contributed to the sale of the property to the Compton Corpo-

ration or through any of the "Compton people"; that the plaintiff did render the service; and that it contributed to the sale of the property through Bruening, one of the "Compton people." The issues of the existence and character of the contract, of Mims' contribution to the sale under the contract, and the reasonable value of it, if any, should have been submitted to the jury.

[4] The price paid by defendant many years before for the property had no connection with this controversy, and evidence on that subject was properly excluded.

[5] The visit of plaintiff to defendant concerning another probable purchaser in case the negotiation with Bruening failed had only a remote bearing on the controversy, and there was no error in excluding evidence relating to it.

[6, 7] Evidence of plaintiff's failure to make a claim against defendant after the sale was competent on the issue between the parties as to the construction placed by the plaintiff on his agreement with defendant. We are unable to see how the telegram of September 29, 1917, from Reid to Bruening, could affect the issue. Its admission was therefore not reversible error.

Reversed.